IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA K. WHITE, | ) | CASE NO. 1:17-CV-2613 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Pro se Plaintiff Debra White ("White") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  Briefing is complete, White having filed her opening brief (see Doc. 12, Doc. 13)[1]; Defendant a response (Doc. 16), White a reply (Doc. 17) and Defendant, with leave of Court, a surreply (Doc. 19).

For the reasons set forth below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**I. Procedural History**

---

[1] White's opening brief is comprised of 32 pages of handwritten notes found within the 328 pages she attached to her motion for an extension of time to file her brief, instanter (Doc. 12).  See Doc. 13 (Order granting White's motion for more time to file her brief, instanter, and identifying the 32 handwritten pages by Page ID#s).

1

White protectively filed her applications for DIB and SSI in April and May 2014, respectively, alleging a disability onset date of February 28, 2014. Tr. 18.[2] She alleged disability based on the following: hypothyroidism (Graves' disease), mediastinal mass, tachycardia, weight loss, hypertension, anxiety, elevated "LFT's," and microcytic anemia. Tr. 395. After denials by the state agency initially (Tr. 251, 252), and on reconsideration (Tr. 281, 282), White requested an administrative hearing (Tr. 305). A hearing was held before an Administrative Law Judge ("ALJ") on May 25, 2016. Tr. 200-226. In her August 17, 2016, decision (Tr. 18-30), the ALJ determined that White is capable of performing her past work, i.e., she is not disabled. Tr. 29. White requested review of the ALJ's decision by the Appeals Council (Tr. 352) and, on September 11, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

White was born in 1959 and was 55 years old on the date her applications were filed. Tr. 354. She attended two years of college and became a licensed physical therapy assistant. Tr. 205. She also worked as an attendant at a children's institution. Tr. 206-211. She last worked in 2014. Tr. 205.

### B. Summary of Relevant Medical Evidence

In April 2014, White presented to the emergency room on the advice of her doctor after she visited him complaining of palpitations, shortness of breath, and weight loss (30-40 pounds in the last month). Tr. 576. Her doctor suspected she had a thyroid mass. Tr. 576. An EKG

---

[2] Citations to the transcript ("Tr." found at Doc. 10) in this report and recommendation refer to the page number found at the bottom right corner of the transcript (e.g., "Tr. 18"). Citations to the parties' briefs refer to the docket number and the page ID# located at the top right of the page.

showed sinus tachycardia (Tr. 490), labwork showed a low TSH level and high Free T3 and T4 levels (Tr. 492-493), a CT chest scan showed a slightly enlarged thyroid, nodular in appearance, secondary to a multinodular goiter or thyroiditis (Tr. 503), and a chest x-ray showed no evidence of acute cardiopulmonary pathology (Tr. 500). She was evaluated for hyperthyroidism by Petrica Manolache, M.D., who described White as severely hyperthyroid showing moderate symptoms. Tr. 587. Dr. Manolache assessed her as probable for Graves' disease and began her on medications.[3] Tr. 587.

By May, her symptoms were improving and she had normal physical exam findings. Tr. 623. In July, lab results showed normal thyroid levels. Tr. 599, 706. In August she had reduced her dosage from three pills to two and stated that she felt pretty good and she had normal physical exam findings. Tr. 627, 629.

She continued to be treated regularly for her Graves' disease and associated symptoms, as well as her hypertension. As the ALJ detailed, she regularly had normal exam findings, normal labwork, normal or stable/improved diagnostic imaging results, and, generally, had few, mild, or no complaints at her medical visits. Tr. 20-21, 24-27. In February 2016, White informed her provider that she had self-decreased her thyroid medication by half in December 2015. Tr. 991, 993. She did not complain of side effects of medication to her doctors. By April 2016 she was not taking any thyroid medication. Tr. 442.

### C. Function Report

---

[3] Graves' disease is an immune system disorder that cause hyperthyroidism. It can cause enlargement of the thyroid gland, palpitations, anxiety, weight loss, tremors, and ophthalmological and skin changes. If left untreated, it can lead to cardiac complications, including heart rhythm disorders and changes in the structure and function of heart muscles. *See Mayo Clinic*, "Graves' Disease," available at https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/syc-20356240.

White completed a function report on August 2, 2014. Tr. 404-411. She wrote that, in a typical day she got up, took her medicine, ate breakfast, relaxed for two hours, bathed, ate lunch, watched television, ate dinner, washed dishes after each meal, took her evening medications, watched more television, and went to bed. Tr. 405. She climbed stairs to wash two loads of clothes once per week; she also did some cleaning and ironed. Tr. 405, 406. She had no problems with personal care. Tr. 405. She prepared her own breakfast, lunch, and dinner. Tr. 406. She went outside three to four times per week, drove, went out alone, and shopped in stores for grocery and household products. Tr. 407. She reported she could lift no more than 20 pounds due to weakness in her arms; pain with squatting, bending and stair climbing; weakness in her legs; shortness of breath when walking; and tremors in her hands causing her to drop things. Tr. 408. She did not know how long she could walk before needing to rest because she had not tried to walk since her illness. Tr. 408. She had no problems getting along with family, friends, neighbors, or others, she talked with family and friends a lot on the phone and sometimes in person, she went to church, she went to a movie once a year, and she went out to eat once every six to eight months. Tr. 408-409. She indicated problems with lifting, walking, stair climbing, squatting, bending, kneeling, and using her hands. Tr. 408. She had no problems paying attention and had not had any problems handling stress or changes in routine. Tr. 408, 410.

### D. Medical Opinion Evidence

#### 1. Physical Therapist's evaluation

On June 18, 2015, physical therapist Karin Kleppel, PT, tested and examined White and completed a functional capacity evaluation. Tr. 711-720. Upon testing, White could push or pull 20-24 pounds of force, sit for 82 minutes, stand or walk for 18.5 minutes, and lie down for

4

10.5 minutes.  Tr. 711.  Her ability to climb stairs, perform fine manipulation, and balance tested at below-average levels.  Tr. 712.  She could lift 11 pounds to shoulder height and carry 16 pounds a distance of 20 feet.  Tr. 712.  She could not bend and reach while standing but could occasionally/frequently reach while sitting.  Tr. 712.  Kleppel listed the following validity concerns with the test results: White did not demonstrate maximum voluntary effort during the examination, was self-limiting during the evaluation due to pain and a fear of increased injury, tested four times more likely to fall on her reach test but reported no falls in the prior year, was aware of correct body mechanics from her prior job as a physical therapy assistant but performed lifting and carrying with poor body mechanics, refused to attempt squatting and crawling tests, gave extremely vague answers to many questions, and reported lesser functional tolerances for sitting and walking than observed during the examination.  Tr. 719.

### 2. Consultative Examiner

On September 9, 2014, White saw Alison Flowers, Psy.D., for a consultative psychological examination.  Tr. 633-639.  White reported that she spent a typical day doing housework, laundry, and shopping if she felt okay.  Tr. 634.  She sometimes went to the gym and liked to attend concerts.  Tr. 634.  With respect to her activities of daily living, White stated that she could dress, bathe, and groom herself; cook and prepare food; do light cleaning, including sweeping and dusting; do laundry; shop; manage money; and drive.  Tr. 636.  Dr. Flowers opined that White could likely remember simple and complex instructions and perform simple tasks.  Tr. 638.  She did not report any history of difficulties with supervisors and coworkers and was able to interact appropriately in the evaluation setting.  Tr. 638.  Dr. Flowers commented that she appeared anxious during the mental status examination, which appeared to impact her performance.  Tr. 639.

### 3. State Agency Reviewers

On September 9, 2014, state agency reviewing physician Gerald Klyop, M.D., evaluated White's physical residual functional capacity (RFC).  Tr. 234-236, 246-248.  Dr. Klyop opined that White could lift 50 pounds occasionally and 25 pounds frequently; stand or walk for 6 hours and sit for 6 hours in an 8-hour workday; frequently crawl; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and must avoid moderate exposure to hazards.  Tr. 234-35, 246-47.  On January 23, 2015, state agency reviewing physician Esberdado Villanueva, M.D., affirmed Dr. Klyop's opinion.  Tr. 262-263, 276-277.

On October 3, 2014, state agency reviewing psychologist Bonnie Katz, Ph.D., evaluated White's mental impairments and opined that White had a mild restriction in activities of daily living, no difficulties in maintaining social functioning and concentration, persistence or pace; and no episodes of decompensation of extended duration.  Tr. 232, 244.  On January 30, 2015, state agency psychologist Leslie Rudy, Ph.D., adopted Dr. Katz' opinion.  Tr. 260, 274.

### E. Testimonial Evidence

#### 1. White's Testimony

White attended the administrative hearing with a non-legal representative and testified.  Tr. 202.  She lives by herself, although her adult son stays with her most of the time.  Tr. 213.  She testified that she is able to do her housework but, because her heart races and her blood pressure elevates, she has to do everything in moderation.  Tr. 212.  For instance, to make it to the hearing on time, she had to get up three hours early so that she could bathe, dress, and prepare herself something to eat.  Tr. 212.  She has to pace herself.  Tr. 212.  She can sweep a couple of rooms (her son does the mopping) and then she goes back to her room and sits down and relaxes for about 45 minutes to an hour.  Tr. 212.  She has to take her blood pressure and

6

monitor her pulse rate because any little thing she does gets her pulse racing. Tr. 212. Once her heart rate goes back down she does a little more housework. Tr. 212. She has to constantly rest this way for everything she does. Tr. 212.

White stated that she can drive but she does not do so. Tr. 213. Her son usually drives her most places. Tr. 213. For the most part she does very little driving; she is afraid because her medications make her dizzy. Tr. 213. She is dizzy all the time with the medications and she also has a lot of pain; her leg cramps and this is also why she is afraid to drive. Tr. 213. Her pain is all over. Tr. 213. When asked where her pain comes from, she explained that she had blacked out the previous summer and hit her head, but that testing and a visit with a neurologist still did not indicate why she had blacked out. Tr. 213-214. She believed there was a reason why she blacked out so she researched her condition and her medications and she found out that a lot of the problems she was having was from her medications. Tr. 214. She told her doctor that her medication had her in bad shape and the doctor advised she take her pills, but White did not feel safe being in her home taking her pills. Tr. 214. She did not have pain prior to taking her medication. Tr. 214-215. White explained how it came to be that she was diagnosed with Graves' disease and stated that her doctors told her that she was going to have to be on medication for it and to eat and rest. Tr. 215. She followed those instructions but she was getting worse; she lost all feeling in her hands and feet and a neurologist told her she has nerve damage. Tr. 215-216. She got her nerves tested but the doctors were saying that it was not nerves, and nobody was trying to figure out why she kept losing feeling and she still does not know why. Tr. 216.

As the hearing, White stated that it was cold in the room and her hands were freezing and that, sitting in the chair, her legs were going to sleep. Tr. 216. She has difficulty using her

7

hands. Tr. 216. If she holds a spoon for too long—she has to grip it tightly because she does not have a lot of strength in her hands—and once she starts stirring with the spoon her hands will blister "and bust open." Tr. 216. If she is carrying something her hand will just let go and the item will drop on the floor. Tr. 216. She has to do everything really slow and test to see if she can hold on to something before she picks it up. Tr. 216. When asked, White stated that she can wash herself, brush her teeth, fix her hair, put on earrings, and hold a pen and write, although she cannot write for long because her hand cramps. Tr. 216-217. When her hands start going numb, but before they are all the way numb, she does what she can do and then she has to flex them to try to wake them back up. Tr. 217. Her legs cramp also and her feet are numb all the time. Tr. 217. At home she wears two pairs of socks and house shoes because her feet stay cold. Tr. 217. She has difficulty walking because of her feet; sometimes she can't "clear them" and she will have to drag them. Tr. 217. She tries to wear shoes with a little support on them so that when her ankles give way, she will be able to move her feet still. Tr. 217. She does not fall when her ankles give way because she does everything at a slower pace. Tr. 217-218. Her knees buckle too, and that is what had been causing her to almost be about to fall, but after she stopped taking her medication a lot of the pain eased up and her knees have stopped collapsing. Tr. 218. She does not use a cane. Tr. 221.

White is not taking her thyroid medication anymore. Tr. 218. She stopped taking it months ago "because I was at risk of falling out." Tr. 218. She explained that she has to go down the stairs to get to the washing machine and the freezer and she told her doctor that pain was buckling her knee. Tr. 218. She believes that the medication caused her pain. Tr. 218. Since she has stopped taking her medication her pain has subsided some, although her knee catches now rather than buckles. Tr. 218. It is mostly on her right side, so when she goes down

8

the steps and feels her knee catching, she leans towards the left side and swings her leg out to make sure that she is stable and won't fall. Tr. 218. When asked how her doctor responded when White told her that she had stopped taking her medication, White replied that the doctor asked her what she did after she stopped taking it and White told her that she went online and researched how she could manage her condition in a healthy way. Tr. 218. White stated that, if you eat a healthy diet, make sure you exercise, rest frequently throughout the day, and keep your stress level down, then you can manage it. Tr. 219. Her doctor asked her how she is maintaining it and she told her doctor that she is taking a natural supplement to help balance her system out and she takes calcium for her bones. Tr. 219. She is covering all her illnesses through supplements trying to maintain a healthy balance. Tr. 219. The doctor said that that was okay, but told White that she had to understand the importance of being able to do everything you need to maintain a balance and that the rest periods are the most important. Tr. 219.

      White stated that she can stand or walk for 30 to 45 minutes and, if she pushes past that, she is short of breath, sweating, and her knees are buckling. Tr. 220. If she rests she can stand again. Tr. 220. How long she has to rest between standing depends on how rapid her heart rate is; it can take anywhere from 45 minutes to an hour for it to go back down. Tr. 220. When she rests she lies down most of the time because she has to slow her breathing. Tr. 220. Out of an 8-hour day, White estimates that she rests for the majority of the time, about 5 hours. Tr. 221. One night she did some ironing beginning at 8:00 p.m. and she didn't finish until 2:00 a.m. because she was out of breath. Tr. 221. All this has worsened since she was on medication. Tr. 221. She believes that, if she had been taken off her medication sooner, she probably could have maintained it and done better. Tr. 221. Because it took her so long to figure out that it was her medication tearing her up, her heart rate and everything else is worse. Tr. 221.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Bruce Holder Reed testified at the hearing. Tr. 221-224. The ALJ discussed with the VE White's past relevant work. Tr. 222-223. The VE explained that both jobs White performed, children's attendant and physical therapy assistant, were medium exertional work according to the DOT but that, per White's testimony, she performed them at the heavy to very heavy exertional level. Tr. 223. The ALJ asked the VE to determine whether a hypothetical individual with White's age, education and work experience could perform her past work if the individual had the following characteristics: can perform medium work; can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can frequently crawl; and must exposure to hazards such as industrial machinery and unprotected heights. Tr. 223-224. The VE answered that such an individual could perform both jobs White previously performed; not as she performed it, but as performed in the national economy per the DOT. Tr. 224.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

10

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 17, 2016, decision, the ALJ made the following findings:

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 20.

2. The claimant has not engaged in substantial gainful activity since February 28, 2014, the alleged onset date.  Tr. 20.

3. The claimant has the following severe impairments: Graves' disease and obesity.  Tr. 20.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 23.

5. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can frequently crawl, occasionally climb ramps and stairs, and never climb ladders, ropes or scaffolds.  She must avoid exposure to hazards, defined as industrial machinery, unprotected heights, and similar things.   Tr. 24.

6. The claimant is capable of performing past relevant work as a physical therapy assistant and a children institution attendant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 29.

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2014, through the date of this decision.  Tr. 29.

### V. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VI. Analysis

### A. White's challenges to Social Security Administration records

As an initial matter, the Court reviews the final decision of the Commissioner, i.e., the decision written by the ALJ, Tr. 18-30. 20 C.F.R. § 405(g). Thus, challenges to what the non-medical disability examiners wrote on White's disability determination explanation are not reviewable.

For the sake of completeness, the undersigned discusses White's complaints. White complains that Social Security Administration Disability Adjudicator who created her disability determination paperwork did so in a way that made it look like she was making up her diagnoses. Doc. 12-1, Page ID# 1450-1451. White explains, "She just made me look like I have some mental problems on paper." Doc. 12-1, Page ID# 1451. However, there is nothing untoward about White's paperwork. Tr. 227-250. The paperwork lists the diagnoses alleged by the claimant, White, with no further ado. Tr. 227. The paperwork also lists White's "Self Reported Weight" and "Self Reported Height" to indicate that the agency relied upon White's self-reported weight and height, not to cast doubt on whether White honestly reported these items, as White appears to suspect.

Next, White states that there are two identical items in the record "stated to be by [consultative examiner] Alison Flowers, but there isn't any proof that she wrote the reports in my file. It appears that they were put in the file by someone else." Doc. 12-1, Page ID# 1478. Following this page in her brief, White includes two pages of the transcript, Tr. 228 and Tr. 240. The first noted page is explaining the agency's unfavorable DIB determination and the second noted page is explaining its SSI determination. The comments made under Dr. Flowers' name were not made by Dr. Flowers, but they are an accurate summary of Dr. Flowers' findings.

White alleges that state agency reviewing psychologist Dr. Katz, who considered White's mental impairments on October 3, 2014, also inappropriately assessed her physical impairments. Doc. 12-1, Page ID# 1454-1455.[5] But Dr. Katz only assessed White's mental impairments. See Tr. 232-233 (Dr. Katz' findings listed under the heading "Psychiatric Review Technique"). White also claims that Dr. Katz' report is false because she stated that White had not complained of pain and that there is no evidence of heart or breathing problems. Doc. 12-1, Page ID# 1455; see also Doc. 12-1, Page ID#1458. Again, Dr. Katz did not fill out the section of the report called "Assessment of Policy Issues" and the ALJ did not rely upon these items. The ALJ independently considered White's reports of pain, heart problems and shortness of breath. Tr. 24-25.

### B. White's challenges to the evidence relied upon by the ALJ

White argues that state agency reviewing physician Dr. Klyop's opinion was insufficient because he did not examine her and test her ability to perform activities like standing. Doc. 12-1, Page ID# 1463. But an ALJ may rely upon non-examining source opinions like those of Dr. Klyop. *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence."); 20 C.F.R. § 404.1527(e).[6]

---

[5] White complains of similar deficiencies in state agency reviewing psychologist Dr. Ruby's opinion. Doc. 12-2, Page ID# 1528.

[6] Both SSR 96-6p and 20 C.F.R. § 404.1527 have been replaced by newer versions; however, the cited versions were in effect at the time of the ALJ's decision in this case.

White argues that the job of physical therapy assistant, the job she did in the past and the job the ALJ determined that she could still perform, could not be performed by an individual with the limitations set forth by Dr. Klyop.[7]  Doc. 12-1, Page ID# 1474.  But the ALJ relied upon VE testimony that an individual with White's assessed limitations could perform her past work as a physical therapy assistant.  Tr. 223-224.  The ALJ's reliance upon VE testimony is proper.  *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) ("The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work, given his RFC[,]" citing 20 C.F.R. § 404.1560(b)(2)).

White argues that the ALJ did not credit her testimony at the hearing.  Doc. 13-2, Page ID#1630.  To the extent this is a challenge to the ALJ's credibility assessment, White's argument is not persuasive.  The ALJ thoroughly restated White's testimony.  Tr. 24-25.  She explained that White's allegations were not entirely consistent with the record evidence.  Tr. 25.  In support, the ALJ spent over three pages describing the longitudinal record evidence, including consistently normal exam findings, largely normal, mild or stable diagnostic and imaging results, White's reports to her providers during office visits wherein she denied numerous associated symptoms, and her reported daily activities.  Tr. 25-28.  *See* SSR 16-3p, 2017 WL 5180304, at *4, 7 (when evaluating a claimant's symptoms, the ALJ examines the entire case record, such as the objective medical evidence and the claimant's statements, including daily activities).

White also states that her Return to Work Services Program Functional Capacity Evaluation dated June 18, 2015, was not considered nor was it properly assessed.  Doc. 12-3, Page ID# 88; Doc. 17, Page ID# 1679.  The ALJ considered the June 18, 2015, functional capacity evaluation authored by physical therapist Karin Kleppel and discussed it at great length.

---

[7] White complains of similar deficiencies in state agency reviewing physician Dr. Villanueva's opinion.  Doc. 12-2, Page ID# 1533.

15

Tr. 28-29. The ALJ remarked that Kleppel, after testing White, had opined that White could perform sedentary or light work and could not perform her past work as a physical therapy assistant. Tr. 28. The ALJ also observed, however, that Kleppel wrote that White did not demonstrate maximum voluntary effort on some testing, was self-limiting during the evaluation, and her formal effort tests were below expected ranges indicating below maximal efforts. Tr. 28. The ALJ explained that Kleppel had validity concerns about White's inconsistent movements because White tested four times more likely to fall but had reported no falls in the past year; she demonstrated poor safety judgment even though she was aware of correct body mechanics (based on her prior job as a physical therapy assistant); she refused to attempt specific tests; and many of her answers to Kleppel's questions were "extremely vague," making it difficult for Kleppel to score her. Tr. 29. The ALJ also stated that Kleppel found White's reported function tolerances to be greater than, and inconsistent with, White's observed function tolerances. Tr. 29. For all these reasons, the ALJ gave Kleppel's opinion that White could not perform her past work and was limited to light or sedentary work "little" weight, concluding that it was an inaccurate assessment for the reasons detailed above. Tr. 29. This was not erroneous. *See Longworth v. Comm'r Soc. Sec.*, 402 F.3d 591, 597 (6th Cir. 2005) (finding that the ALJ properly discounted testing results based on the examiner's observation that the claimant "appeared to put forth little effort in testing which is not thought to be a valid representation of functioning"); 20 C.F.R. § 404.1527(c) (the ALJ considers the testing a source has performed and the supportability of the opinion).

     White appears to argue that the ALJ did not consider all of her impairments, and she lists them. Doc. 17, Page ID# 1681-1683 (listing Graves' disease, hyperthyroidism, thyrotoxicosis, hypertension, obesity, and affective disorder). This is incorrect; the ALJ discussed White's

16

Graves' disease, hypertension, obesity and affective disorder. See, e.g., Tr. 20-21. White's hyperthyroidism and thyrotoxicosis are thyroid-related issues, as is the specific diagnosis of Graves' disease. The ALJ thoroughly considered White's thyroid issues, including the fact that her thyroid issues were treated with medication; that laboratory testing showed normal thyroid levels indicating that her condition had stabilized, including after White decreased her thyroid medication without medical advice; and that White eventually stopped taking her thyroid medication completely without first notifying her doctor. Tr. 20-21, 25, 26, 27.

Finally, White attaches to her reply brief documents purporting to show details from an EKG test she had on January 30, 2018, and another medical record from 2018 listing diagnoses. Doc. 17-1. White includes these documents "to show that I have never recovered from my illnesses." Doc. 17, Page ID# 1684. The documents attached by White to her reply are not properly before the Court upon review of the ALJ's decision, which was issued roughly a year and half prior to the date of the new medical records. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (the court's review is limited to the evidence presented to the ALJ). Second, to the extent that White is requesting a remand for consideration of new and material evidence under sentence six of 42 U.S.C. §405(g), she does not explain how the new evidence is material. Moreover, "[i]t is well established that a Sentence Six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing." *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)). If White is alleging that her condition worsened, an appropriate remedy would be to file a new claim for benefits as of the date that her condition rose to the level of a disabling impairment. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

In sum, the ALJ did not commit error and her decision is supported by substantial evidence. Therefore, her decision must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated: October 16, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)